HUBERT L. PFAHLER, PETITIONER-RESPONDENT, v. ECLIPSE PIONEER DIVISION OF BENDIX AVIATION CORPORATION, RESPONDENT-APPELLANT.

Argued March 26, 1956—Decided May 14, 1956.

*Mr. Walter H. Jones* argued the cause for appellant (*Mr. Walter R. Hespe,* on the brief).

*Mr. Sidney Reitman* argued the cause for respondent (*Mr. Lawrence E. Maisel,* on the brief; *Messrs. Kapelsohn, Lerner, Leuchter & Reitman,* attorneys).

The opinion of the court was delivered by

WACHENFELD, J. The endeavor here is to reverse a judgment of the Appellate Division affirming a judgment of the County Court which in turn affirmed a determination by the Workmen's Compensation Bureau concluding that the Bureau had jurisdiction over the petitioner's claim and that it was not barred by the statute of limitations. There being a dissenting opinion in the Appellate Division, the appeal before us is one of right. *R. R.* 1:2–1(*b*).

The employer contends the petitioner's claim was filed too late and is barred by the two-year statute of limitations, thereby depriving the court of jurisdiction. The facts in the main are not disputed except as hereinafter noted.

The parties before the Bureau stipulated that the issue of jurisdiction should first be tried and decided before any proof was to be submitted regarding liability for the claimed injury.

The injury is alleged to have occurred on the 6th of December 1950, but the petition for compensation was not filed until the 24th of February 1954, approximately three years and three months after the incident itself. The delay is attributable to the circumstances narrated in the factual developments.

Under *R. S.* 34:15–51, every claimant for compensation must file his application within two years after the accident occurred, or where the employer has already paid a part of the compensation, then within two years after the last payment made. Medical treatment furnished by the employer to the employee is considered as compensation. *Oldfield v. New Jersey Realty Co.,* 1 *N. J.* 63, 67 (1948).

However, a mere medical examination to determine whether a compensable injury exists is not included within this rule. *Sampson v. Thornton*, 8 *N. J.* 415 (1952); *Schwarz v. Federal Shipbuilding & Dry Dock Co.*, 16 *N. J.* 243 (1954).

The employee "pulled his back" while using a large wrench as he was tightening a nut which caught, causing him to strain his back on December 6, 1950. Two days thereafter, on December 8, he was examined by Dr. Rucker, the plant physician, X-rays were taken, his back was "taped up" and diathermy treatments were supplied "twice a week" for "about seven or eight weeks." During this period he saw Dr. Rucker "once a week." This, from the record, is the petitioner's testimony.

The company doctor denies he taped the petitioner's back, and the appellant, although it does not concede the extent of treatments testified to by the petitioner, does admit he was treated by diathermy "from December 18, 1950 to December 27, 1950," the number of times not being disclosed in the record. Following the diathermy applications at this time, the petitioner was "discharged from further treatments."

Either "in the latter part of December 1951 or in the early part of 1952" the petitioner again visited the company dispensary and complained about his back. He had "a little pain in my back and my leg was numb, my left leg." "It was bothering me. I could not work." The dispensary sent the petitioner to the company doctor, Dr. Rucker. He "looked" at the petitioner and referred him to Dr. Policastro, and in the early part of March 1952 Dr. Policastro "examined" the petitioner. The examination is described by the petitioner as: "He was hitting me with rubber hammers all over." When asked by the Deputy Director what Dr. Policastro did: "Did he give you any advice, treatments, or did he give you both?" the witness answered: "He gave me advice."

Following this incident the petitioner was told by Miss Markham in the office that "they won't give me any more

medical treatments." Thereafter the petitioner was treated by his own doctor.

Dr. Policastro was not called as a witness. Dr. Rucker testified he saw the petitioner in April 1952. He was referred to him on April 8, 1952 in regard to a back injury. "He was examined by me and an examination showed a restricted trunk flexion to 70 degrees with some tenseness over the posterior aspect of the left side. He could complete the squat test. There was no restriction of extension or lateral bending of the trunk. I could find no spasm over the lumbosacral or the sacroiliac regions and he was not treated by me. I sent this man to Dr. Policastro for diagnosis only. That is the extent of my connection."

He also denied treating the petitioner in December 1950, claiming that all he did was to take an X-ray. There was no notation on the record and he did not know who referred the petitioner to him and he had no record that the petitioner was receiving diathermy treatment at the plant. He admits he examined the petitioner on April 8, 1952, but he "felt it was more a neurological problem than orthopedic" and he therefore sent him to Dr. Policastro. He denies he received a report from Dr. Policastro, although admittedly he was the plant doctor in charge of treating individuals who were hurt at the plant.

*Sampson v. Thornton, supra,* seems dispositive of the issues here presented. As in that case, there is no justification for differentiating the visit in April 1952 from a series of medical consultations admittedly embracing treatments provided for by the company in 1950 and 1951. The latter visits are not to be considered in the abstract but in their propinquity to the previous course of conduct and surrounding circumstances.

*Schwarz v. Federal Shipbuilding & Dry Dock Co., supra,* is not to the contrary. The record there clearly showed the examinations in question were for the purpose of determining "causal relationship which was the issue in the case."

Here no such issue is presented. The respondent's answer admits the petitioner sustained injury by accident arising

out of and in the course of his employment on the date alleged in the petition.

"Treatment" is a broad term covering all steps taken to effect a cure of the injury or disease. It includes examination and diagnosis as well as application of remedies. *Hesler v. Ford,* 221 *Ala.* 592, 130 *So.* 203 (*Ala. Sup. Ct.* 1930); *Sampson v. Thornton, supra.*

The Deputy Director found:

"I am satisfied from a consideration of proofs that the respondent's plant doctor saw the petitioner on April 8, 1952; that at that time the respondent, through its plant doctor, Dr. Rucker, referred the petitioner to Dr. Policastro for diagnosis. I cannot, however, agree with the respondent's position that the actions of Dr. Rucker on April 8, 1952, did not represent the rendition of any medical treatment. * * * Dr. Rucker, on April 8, 1952, * * * did render and furnish to the petitioner advice and this is, in my opinion, as much medical treatment as though he had applied tape to the back or bandage or given actual administration of medication."

At the county level the court held:

"I am in accord with the Rule of the Deputy Director that Dr. Rucker, both in December of 1950, and on April 8, 1952, rendered treatment to Hubert L. Pfahler, and that, while Dr. Rucker on the latter date did not actually prescribe or give any heat therapy or massage, he nevertheless rendered and furnished to the petitioner advice and, as a result of such advice, he sent petitioner to Dr. Policastro, a neurological specialist. When he did this he rendered medical treatment to the petitioner."

The Appellate Division, speaking of the visit of April 8, 1952, said:

"Dr. Rucker examined him and referred him to Dr. Policastro for a neurological examination. After petitioner was examined by the neurologist he was told by the plant personnel office for the first time that he would receive no further treatments by the company. * * *

* * * the petitioner was entitled to regard the examination of April 8, 1952, as part of a continuous course of medical treatment in the absence of any disclaimer of liability by the employer. * * *

We reach the same conclusion as that reached by the Deputy Director, and incidentally by the County Judge, that the employer

did supply medical treatment to the petitioner on April 8, 1952, which constituted a payment of compensation within the meaning of the Act, and that, therefore, the petition was timely filed."

The record justifies the factual interpretation already made in each of three lower tribunals and there is little to warrant our coming to a contrary conclusion.

Where two lower courts have considered the facts and reached concurrent findings, this court will not make a new and independent finding unless the error in the concurrent findings is so palpable that a new finding by us is necessary to insure essential justice. *Midler v. Heinowitz,* 10 *N. J.* 123, 128 (1952).

The conclusions reached below and reiterated at three different judicial levels, from our examination of the record, spell out substantial justice and are basically in accord with our views.

The judgment below is affirmed.

HEHER, J. (dissenting). December 6, 1950 was the date of the pleaded industrial accident. The asserted back injury did not interrupt the continuity of the employment. The petition for compensation was not filed until February 24, 1954. "Medical treatment" in April 1952 is alleged as a "payment of compensation" by the defendant employer within the intendment of the statutory provision, *R. S.* 34:15–41; 34:15–51, that "in case a part of the compensation has been paid by the employer," then the two-year limitation period shall run from the "last payment of compensation."

"Medical treatment" is compensation within the statutory concept. *Oldfield v. New Jersey Realty Co.,* 1 *N. J.* 63 (1948). But mere "examination" or "diagnosis" is not in this category. The employer is obliged, *R. S.* 34:15–15, to "furnish" to the injured workman "such medical, surgical and other treatment, and hospital service as shall be necessary to cure and relieve the workman of the effects of the injury and to restore the functions of the injured member or organ where such restoration is possible"; and the obligation is

enforceable as therein provided. Where the employer provides such "treatment" in fulfillment of the statutory duty, there is "payment" of compensation within the meaning of the statute, just as much so as the making of compensation for the ensuing disability or loss of physical function. *Schwarz v. Federal Shipbuilding & Dry Dock Co.,* 16 *N. J.* 243 (1954); *Betsy Ross Ice Cream Co. v. Greif,* 127 *N. J. L.* 323 (*Sup. Ct.* 1941). The distinction between "examination" and "treatment" is made in *Sampson v. Thornton,* 8 *N. J.* 415 (1952).

Dr. Rucker did not "treat" the workman on April 8, 1952, following the latter's call at the plant dispensary, complaining: "I had a little pain in my back and my leg was numb, my left leg." The workman himself so testified: "Q. Did Dr. Rucker treat you at that time? A. I don't know what you call treatments. He looked at me and sent me to Dr. Policastro." Dr. Rucker testified that he "examined" the workman and "sent" him to "Dr. Policastro for diagnosis only; that is the extent of my connection." He "felt it was a more neurological problem than orthopedic. It was out of my realm * * *." Dr. Policastro "examined" him. The workman testified:

"Q. After you saw Dr. Policastro, did you have any conversation with respect to treatment with anybody at the plant personnel office? A. No.

Q. Were you told whether or not you were going to get any further treatment by the company? A. They told me in the office, Miss Markham.

Q. What did she say? A. She told me they won't give me any more medical treatments.

Q. Did you, thereafter, get any further treatments by either Dr. Rucker or Dr. Policastro, at the plant dispensary? A. No, sir.

Q. Did you seek medical treatment of your own? A. Yes, sir.

Q. Eclipse did not send you to Dr. Pope [the workman's family physician]? A. No, sir.

Q. No question about that, they turned you down? A. They flatly refused me.

Q. They flatly refused treatments and that is why you went to Dr. Pope? A. That is right.

Q. Isn't that a fact, that you went to Dr. Pope for treatment because you were turned down at Eclipse for treatment? A. Yes, sir."

The period of limitation, measured from the time of the accident, had not then expired. It would not expire until the following December at the very least, and "seven or eight weeks" later if the testimony of diathermic treatments at the outset be accepted; but the workman did not invoke the statute, and there is no explanation of his nonaction.

The Appellate Division held that in "cases of this type the determining factor is whether the total pattern of conduct would be likely to lull the petitioner into resting on his rights until the time for the filing of the petition under the Act had elapsed"; and that as a consequence of the "medical treatment in the form of taping of the petitioner's back and the diathermy therapy" furnished by the employer immediately after the mishap of December 5, 1950, "and notwithstanding the lapse of time between the rendering of this treatment and the events of April, 1952," the workman "was entitled to regard the examination of April 8, 1952, as part of a continuous course of medical treatment in the absence of any disclaimer of liability by the employer." And, though the question here is one of jurisdiction, it was suggested that this view is countenanced by the oft-repeated "philosophy" that the Compensation Act "being remedial in nature should be construed to effectuate the beneficent purposes intended by the legislature."

Affirming the judgment, my brethren say that there is "no justification for differentiating the visit in April 1952 from a series of medical consultations admittedly embracing treatments provided for by the company in 1950 and 1951"; that the "latter visits are not to be regarded in the abstract but in their propinquity to the previous course of conduct and surrounding circumstances," and "treatment" is a "broad term covering all steps taken to effect a cure of the injury or disease," including "examination and diagnosis as well as application of remedies."

But this reasoning ignores, I would suggest, the principle of our earlier cases equating "treatment" with "compensation" in the interpretation of the particular limitation clause barring action after two years from the "last payment of com-

pensation," and thus an undue enlargement of the statutory rule. An "examination" or "diagnosis," without more, cannot be deemed an undertaking to "furnish," much less the furnishing of, medical "treatment" within the coverage of the Compensation Act. The jurisdictional terms are to be given a reasonable construction comporting with the evident legislative societal policy of repose to avoid the mischief of undue delay in the enforcement of the right. Here, the earlier treatments had ceased long since; the limitation period had commenced to run, and could be tolled only by further "treatment," in itself compensation in the legislative sense. The workman was not misled by the conduct of the employer; there is no estoppel by matter *in pais*.

"Medical and surgical treatment" signify "what is done by a physician of any recognized type or by a surgeon in diagnosing a bodily ailment and seeking to alleviate or cure it. It includes the things done by the patient to carry out specific directions given for these ends by a physician." *Barkerding v. Aetna Life Insurance Co.*, 82 *F. 2d* 358 (5 *Cir.* 1936).

I would reverse the judgment.

Mr. Chief Justice VANDERBILT and Mr. Justice OLIPHANT join in this opinion.

*For affirmance*—Justices WACHENFELD, BURLING, JACOBS and BRENNAN—4.

*For reversal*—Chief Justice VANDERBILT, and Justices HEHER and OLIPHANT—3.